**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**January 24, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

DENVER BIBLE CHURCH;
COMMUNITY BAPTIST CHURCH;
JOEY RHOADS,

    Plaintiffs - Appellants,

v.

GOVERNOR JARED POLIS, in his
official capacity as Governor, State of
Colorado; JILL HUNSAKER RYAN, in
her official capacity as Executive Director
of the Colorado Department of Public
Health and Environment; COLORADO
DEPARTMENT OF PUBLIC HEALTH
AND ENVIRONMENT; XAVIER
BECERRA, in his official capacity as
Secretary, United States Department of
Health and Human Services; UNITED
STATES DEPARTMENT OF HEALTH &
HUMAN SERVICES; ALEJANDRO
MAYORKAS, in his official capacity as
Acting Secretary, United States
Department of Homeland Security;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; JANET L.
YELLEN, in her official capacity as
Secretary, United States Department of the
Treasury; UNITED STATES
DEPARTMENT OF  THE TREASURY,

    Defendants - Appellees.

No. 20-1391
(D.C. No. 1:20-CV-02362-DDD-NRN)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **MORITZ**, **KELLY**, and **BRISCOE**, Circuit Judges.

_____

In this appeal from the denial of a preliminary injunction, plaintiffs—Denver Bible Church, Community Baptist Church, and Joey Rhoads (Community Baptist's pastor)—challenge the validity of various restrictions that Colorado imposed as part of its effort to combat the COVID-19 pandemic, as well as the federal government's award of COVID-19 relief funds to Colorado.[1] According to plaintiffs, Colorado's restrictions violate their First Amendment right to the free exercise of religion, and the federal aid violates federal statutes that prohibit religious discrimination.

But Colorado has dramatically amended and loosened its COVID-19 restrictions since plaintiffs filed this case. Consequently, Colorado no longer imposes any COVID-19 restrictions on plaintiffs, and all but one of plaintiffs' claims against Colorado are moot. Moreover, neither the voluntary-cessation nor the capable-of-repetition-yet-evading-review exceptions to mootness apply here because Colorado has established that it is not reasonably likely to reinstate the challenged restrictions against plaintiffs.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[1] We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

Plaintiffs' remaining claim against Colorado is that the state's emergency disaster statute is facially unconstitutional. We conclude that the district court did not abuse its discretion in denying a preliminary injunction on this claim, which is unlikely to succeed because the statute is neutral and generally applicable.

As for plaintiffs' claims arising from federal COVID-19 aid, we likewise determine that the district court did not abuse its discretion in denying plaintiffs a preliminary injunction enjoining such aid. Plaintiffs' claims on this front are unlikely to succeed because plaintiffs—who fail to meet their burden of showing that their injuries are either traceable to such federal aid or redressable by an injunction enjoining such aid—lack standing to bring them. Accordingly, for these reasons and as explained in more detail below, we dismiss in part and affirm in part.

## Background

Plaintiffs filed this action in August 2020. On the state side, they sued the governor of Colorado, the Colorado Department of Public Health and Environment (CDPHE), and the executive director of CDPHE (collectively, the State). Plaintiffs asserted a variety of claims against the State, arguing that (1) the Colorado Disaster Emergency Act (CDEA), Colo. Rev. Stat. §§ 24-33.5-701 to 24-33.5-717, is facially unconstitutional under the First Amendment's free-exercise clause; (2) the executive and public-health orders, as applied, violate their First Amendment free-exercise right; (3) the executive and public-health orders are unconstitutionally vague; (4) the governor's declaration of an emergency violated the CDEA; (5) the executive orders violate the Colorado constitution and exceed the scope of the governor's authority

3

under the CDEA; and (6) the public-health orders violate their due-process rights and Colorado's administrative-procedure act.[2]

On the federal side, plaintiffs sued the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Treasury, as well as the heads of those federal agencies (collectively, the federal agencies). Plaintiffs contended that the federal agencies violated the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb–4, with respect to unspecified federal funding provided to Colorado under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), 42 U.S.C. § 5121–5208, and the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, 134 Stat. 281 (2020). Plaintiffs additionally argued that the federal agencies violated the Stafford Act's prohibition against religious discrimination.[3]

Overall, plaintiffs sought to enjoin the State from enforcing its executive and public-health orders, to require the State to terminate such orders, and to prohibit the federal agencies from "approving or providing any future assistance to" Colorado. App. vol. 1, 47. To that end, plaintiffs filed a motion for a preliminary injunction. The district court granted plaintiffs' motion "in relatively narrow part," concluding that they were entitled to a preliminary injunction on their claim that the "numerical

---

[2] Plaintiffs also alleged violations of their rights to free speech and assembly. But they did not seek a preliminary injunction on such claims, so those claims are not before us in this appeal.

[3] Plaintiffs also alleged that the State violated the Stafford Act. But they did not seek a preliminary injunction on such claim, so it is not before this court.

occupancy limitations for worship services" and "the requirement that congregants wear face masks at all times during worship services" violated their First Amendment right to the free exercise of religion.[4] App. vol. 6, 1407–08.

But as relevant to this appeal, the district court denied the remainder of plaintiffs' preliminary-injunction motion, concluding that plaintiffs failed to make the required strong showing of a substantial likelihood of success on the merits. The district court determined that both (1) the facial challenge to the CDEA and (2) the as-applied challenge to the social-distancing requirement in the executive and public-health orders were unlikely to succeed because the statute and the social-distancing requirement were neutral and generally applicable and therefore likely constitutional. Next, the district court discerned no likely due-process violation in the CDPHE's decision to issue public-health orders without providing notice and a hearing, reasoning that such process is not typically required either for generally applicable rules that affect the public at large or for rules issued in emergency situations. The district court further concluded plaintiffs' state-law claims were likely barred by the Eleventh Amendment, which makes states immune from suits brought by citizens in federal court. As for the claims against the federal agencies, the district court determined that plaintiffs likely lacked constitutional standing to bring such claims. It

---

[4] The State initially appealed that ruling but later voluntarily dismissed its appeal in light of changes it implemented to the relevant orders in response to the Supreme Court's decision in *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).

therefore denied a preliminary injunction on "most of the[] asserted claims."[5] *Id.* at 1408.

Plaintiffs then filed this appeal. They also unsuccessfully sought an injunction pending appeal from the district court, this court, and the Supreme Court. And critically, since the district court's October 2020 ruling, Colorado has significantly amended its executive and public-health orders. It currently imposes no COVID-19 restrictions of any kind on plaintiffs.

**Analysis**

**I.    Mootness**

Citing the changes to its COVID-19 executive and public-health orders, the State argues that plaintiffs' claims are now moot.[6] "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal . . . jurisdiction." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (quoting *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005)); *see also* U.S. Const. art. III, § 2, cl. 1 (extending federal judicial power to "[c]ases" and "[c]ontroversies"); *Fleming v.*

---

[5] The district court also concluded that plaintiffs were unlikely to succeed on their claims that the executive and public-health orders were unconstitutionally vague. Plaintiffs do not challenge that ruling on appeal; nor do they challenge the district court's ruling on their state-law claim that the governor violated the CDEA. These claims are therefore not at issue in this appeal.

[6] The parties addressed mootness to some extent in their initial briefing. But after oral argument, we ordered supplemental briefing on this issue, seeking updates on the applicable executive and public-health orders and additional clarity on the parties' positions.

*Gutierrez*, 785 F.3d 442, 444 (10th Cir. 2015) (noting that we lack subject-matter jurisdiction when appeal is moot). We review mootness issues de novo. *Rio Grande*, 601 F.3d at 1109.

A case or controversy becomes moot "when it is impossible for the court to grant any effectual relief whatsoever to a prevailing party." *Colo. Off-Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004). "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Rio Grande*, 601 F.3d at 1110 (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)). "Thus, 'if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief what[so]ever to a prevailing party, we must dismiss the case, rather than issue an advisory opinion.'" *Fleming*, 785 F.3d at 445 (quoting *Stevenson v. Blytheville Sch. Dist. No. 5*, 762 F.3d 765, 768 (8th Cir. 2014)).

Here, the State asserts that because it has "lifted or let expire all restrictions on houses of worship, including capacity limitations, masking requirements," social-distancing rules, and sanitization measures, plaintiffs "are not subject to any [State-issued] COVID-19 restrictions." Aplee. Supp. Br. 2. This accurately describes the state of affairs in Colorado. For instance, the current primary public-health order contains no social-distancing requirement at all; it merely encourages such distancing. Similarly, this order includes a mask requirement for unvaccinated individuals in certain high-risk settings, but churches are not included in the list of high-risk settings, and the order includes an express exception for individuals

7

officiating or participating in religious services.[7]

Thus, most of plaintiffs' claims against the State—those premised on COVID-19 restrictions that no longer apply to them—are now moot. To see why, we walk through the various forms of relief plaintiffs seek. *See Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (noting that we "must decide whether a case is moot as to 'each form of relief sought'" (quoting *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019))).

First, plaintiffs seek declaratory judgments that (1) the executive and public-health orders violate their First Amendment free-exercise rights, (2) the State deprived them of constitutional due process by issuing public-health orders without notice and a hearing, and (3) the State issued the executive and public-health orders in violation of various state laws. But declaratory-judgment claims become moot if circumstances change such that the defendants are not "actually situated to have their future conduct toward the plaintiff altered by the court's declaration of rights." *Jordan v. Sosa*, 654 F.3d 1012, 1025–26 (10th Cir. 2011). And here, although the

---

[7] The current primary public-health order is the Eleventh Amended PHO 20-38, effective through January 31, 2022. *See* Colo. Dep't of Pub. Health & Env't, Pub. Health & Exec. Ords., https://covid19.colorado.gov/public-health-executive-orders (last visited Jan. 14, 2022). This order postdates the State's supplemental briefing, which attached and discussed the Ninth Amended PHO 20-38 (effective through November 30, 2021). Yet for purposes of evaluating plaintiffs' claims in this case, the Ninth and Eleventh versions appear largely identical: neither imposes any restrictions on houses of worship. And indeed, the State has pledged to file a letter of supplemental authority in the event it issues an amended executive or public-health order that imposes any restriction on plaintiffs. To date, it has not done so. We therefore focus our analysis on the most current order as of the date of this opinion—the Eleventh—in the interest of remaining as current as possible.

State continues to issue amended executive and public-health orders related to the pandemic without providing notice or a hearing to individual affected parties, the amended orders no longer contain any provisions that apply to plaintiffs. Thus, the circumstances have shifted such that the State is not situated to have its future conduct *toward plaintiffs* changed by this court's declaration of rights. *See id.* at 1026. In other words, none of these declarations—that some former version of the orders violated plaintiffs' free-exercise rights, that plaintiffs were entitled to notice and a hearing before the State issued those former orders, or that the State violated state law in issuing the former orders—would have any effect on the State's future conduct toward plaintiffs because the State no longer imposes the complained-of restrictions on plaintiffs.

Plaintiffs also sought injunctive relief to prevent the State from enforcing its COVID-19 orders against them and to require the State to publicly terminate such orders. Yet if a defendant has carried out the action that a plaintiff sought to compel through an injunction, then the claim for injunctive relief is moot because "[t]here is no point in ordering an action that has already taken place." *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 728 (10th Cir. 1997). In other words, a claim for injunctive relief is moot if there is no reasonable likelihood that the injunction would result in any changes. *Id.* And here, an injunction would have no effect because the State has already ceased enforcing any COVID-19 restrictions against plaintiffs and has superseded or allowed to expire the orders that formerly applied to plaintiffs. *See id.*

Faced with this apparent mootness, plaintiffs invoke the voluntary-cessation

exception, arguing that their claims are not moot because the State voluntarily changed the restrictions and may reinstate them at any time. The voluntary-cessation "exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Rio Grande*, 601 F.3d at 1115 (quoting *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008)). Yet voluntary actions may nevertheless moot a case "if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Id.* at 1115–16 (quoting *Nat'l Advert. Co. v. City of Mia.*, 402 F.3d 1329, 1333 (11th Cir. 2005) (per curiam)).

As the party asserting mootness, the State bears a "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (alteration in original) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). To carry this burden, the State "must do more than offer 'a mere informal promise or assurance . . . that the challenged practice will cease' or 'announce[] . . . an intention to change.'" *Prison Legal News*, 944 F.3d at 881 (omissions and alterations in original) (quoting *Rio Grande*, 601 F.3d at 1118). At the same time, "the '[w]ithdrawal or alteration of administrative policies can moot an attack on those policies.'" *Rio Grande*, 601 F.3d at 1117 (alteration in original) (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991)). "And the 'mere possibility' that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy." *Id.*

10

(quoting *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983)). In other words, "[a] case 'cease[s] to be a live controversy if the possibility of recurrence of the challenged conduct is only a "speculative contingency."'" *Id.* (second alteration in original) (quoting *Burbank v. Twomey*, 520 F.2d 744, 748 (7th Cir. 1975)).

Here, the State contends that there is no reasonable expectation it will ever reinstate the challenged COVID-19 restrictions against plaintiffs. In support, it points out that it initially imposed the challenged restrictions in the absence of Supreme Court guidance on the constitutional limitations of such restrictions. But after the decisions in *Roman Catholic Diocese*, 141 S. Ct. 63, and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), the State "listened to the Supreme Court's direction and put these decisions into action" by including religious exemptions in its COVID-19 orders. Aplee. Supp. Br. 9. For instance, although the current primary public-health order includes a mask requirement for unvaccinated individuals in certain high-risk, indoor settings, it also includes an exemption to this requirement for officiating or participating in a religious service. Similarly, the order includes a vaccination requirement for indoor events of over 500 individuals in certain counties, but such requirement does not apply to houses of worship. Thus, we agree with the State that "it is unreasonable to expect that [the State] will disregard Supreme Court precedent and impose the same restrictions on houses of worship again." *Id.*; *see also Hawse v. Page*, 7 F.4th 685, 693 (8th Cir. 2021) (noting that even if the county were to tighten COVID-19 restrictions at some point in the future, "there is no reasonable expectation that the [c]ounty would flout the Supreme Court's intervening

11

pronouncements on equal treatment between religious exercise and comparable secular activity").

The State additionally points out that advances in pharmaceutical tools—primarily COVID-19 vaccines—render it unlikely that the State will return to "traditional non[]pharmaceutical interventions like capacity limitations and masking requirements," even if the pandemic worsens again in the future. For example, the State notes that when faced with the recent surge in COVID-19 cases caused by the Delta variant, it "did not resort back to the types of traditional non[]pharmaceutical interventions that [plaintiffs] complain of here." Aplee. Supp. Br. 10. Instead, it took steps to increase access to vaccines and to mandate vaccination in certain situations.[8] *See Hawse*, 7 F.4th at 692–93 (finding it persuasive, on voluntary-cessation inquiry, that county did not impose capacity limitations on houses of worship despite emergence of Delta variant).

In response, plaintiffs rely on two recent Supreme Court decisions that granted injunctions pending appeal of certain COVID-19 restrictions and argue that the

---

[8] We recognize the reality of the recent surge in COVID-19 cases—a surge related, at least in part, to the Omicron variant. *See* Ctrs. for Disease Control & Prevention, Omicron Variant: What You Need to Know, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited Jan. 14, 2022). The parties have not specifically addressed this issue in any supplemental filings. As noted earlier, the State promised to notify this court in the event it issues any orders that impose restrictions on houses of worship. We have received no such notification; nor do we see any such restrictions in the current public-health order, which took effect as the Omicron surge was beginning. The Omicron surge therefore does not impact our analysis, except to underline the strength of the State's position that it is not reasonably likely to reimpose pandemic-related restrictions on plaintiffs even when facing a surge in COVID-19 cases.

State's history of "moving the goalposts" renders this case not moot. *Tandon*, 141 S. Ct. at 1297 (finding appeal of COVID-19 restrictions not moot because of frequency with which state changed them); *see also Roman Cath. Diocese*, 141 S. Ct. at 68 (finding it "clear" that free-exercise challenge to COVID-19 restrictions was "not moot" because "[t]he [g]overnor regularly change[d] the classification of particular areas without prior notice" such that "the applicants remain under a constant threat" of restrictions being reinstated). Yet we agree with the State that these cases are distinguishable because, contrary to plaintiffs' assertion, the State here has no history of moving the goalposts. *Cf. Prison Legal News*, 944 F.3d at 882 (noting that voluntary-cessation "inquiry is fact-specific"). For instance, in *Tandon*, "California officials changed the challenged policy shortly after [plaintiffs'] application was filed." 141 S. Ct. at 1297. But here, the State has "steadily loosened" its restrictions over time and has included religious exemptions in its more recent executive and public-health orders. State Aplee. Br. 20. Nor is this case like *Roman Catholic Diocese*, where New York was using a color-coded dial system to quickly and regularly change restrictions without prior notice; here, the current public-health order expressly supersedes the State's prior dial system (and has done so since April 2021).[9] *See* 141 S. Ct. at 68.

---

[9] The system in *Roman Catholic* consisted of color-coded zones based on the prevalence of COVID-19; for example, "[i]n red zones, no more than 10 persons [could] attend each religious service, and in orange zones, attendance [was] capped at 25." 141 S. Ct. at 66, 68; *see also id.* at 72–73 (Kavanaugh, J., concurring) (explaining that color code is based on prevalence of COVID-19). Here, the State's

13

Thus, any chance of the State reimposing the challenged restrictions on plaintiffs is entirely speculative, stemming only from the uncertainty inherent in the pandemic and the State's general authority to impose restrictions in emergencies. And we reject plaintiffs' position that such a speculative possibility is sufficient to invoke the voluntary-cessation exception. *See Rio Grande*, 601 F.3d at 1117 (explaining that voluntary-cessation exception does not apply "'if the possibility of recurrence of the challenged conduct is only a "speculative contingency"'" (quoting *Burbank*, 520 F.2d at 748)); *cf. also Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 n.4 (1st Cir. 2021) ("That the [g]overnor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot.").

In sum, the State has met its burden of showing "that the challenged conduct cannot reasonably be expected to start up again."[10] *Friends of the Earth*, 528 U.S. at 189 (quoting *Concentrated Phosphate*, 393 U.S. at 203). Nothing about the changes in the executive and public-health orders appears to be an attempt to evade liability in this litigation (indeed, plaintiffs never suggest as much); the State has continued to

---

now-superseded dial system similarly classified counties by COVID-19 prevalence using color codes that corresponded to particular restriction levels.

[10] In their opening brief, plaintiffs cite *County of Butler v. Wolf*, 486 F. Supp. 3d 883 (W.D. Pa. 2020), *appeal dismissed sub nom County of Butler v. Governor of Pa.*, 8 F.4th 226 (3d Cir. 2021), *cert. denied*, 2022 WL 89363 (Jan. 10, 2022), in support of their voluntary-cessation argument. There, the district court relied on the voluntary-cessation exception to reject a mootness argument because the orders at issue had merely been suspended. *Cnty. of Butler*, 486 F. Supp. 3d at 911–12. Here, though, the current order expressly supersedes prior orders, so *County of Butler* is easily distinguishable.

decrease restrictions over time, even when faced with increasing COVID-19 cases; and the State has followed and intends to continue following recent Supreme Court precedent by incorporating religions exemptions into current and future restrictions. We therefore conclude that the voluntary-cessation exception does not apply here. *See Hawse*, 7 F.4th at 693; *Calvary Chapel of Bangor v. Mills*, No. 20-cv-00156, 2021 WL 2292795, at *12–13 (D. Me. June 4, 2021) (concluding that voluntary-cessation exception did not apply based on absence of color-coded system and fact that governor's actions since May 2020 were almost entirely in direction of easing restrictions), *appeal docketed*, No. 21-1453 (1st Cir. June 14, 2021). Most of plaintiffs' claims against the State, as detailed above, are therefore moot.[11]

"When a case becomes moot on appeal, the ordinary course is to vacate the judgment below and remand with directions to dismiss." *Kan. Jud. Rev. v. Stout*, 562 F.3d 1240, 1248 (10th Cir. 2009). We do this "because '[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance,

_____

[11] For the first time in their supplemental brief on mootness, plaintiffs invoke the mootness exception for conduct capable of repetition yet evading review. This exception requires the party asserting it to show that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration[] and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1159 (10th Cir. 2019) (quoting *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016)); *see also Jordan*, 654 F.3d at 1036 (noting that party asserting this exception bears burden of proving it applies). Here, as discussed in the text, plaintiffs only speculate that they will again be subject to the challenged COVID-19 restrictions; they therefore have not met their burden to demonstrate "a reasonable expectation" that they will be subject to the same COVID-19 restrictions in the future. *N.M. Health Connections*, 946 F.3d at 1159 (quoting *Brown*, 822 F.3d at 1166). Thus, this exception does not apply here.

ought not in fairness be forced to acquiesce in the judgment.'" *Wyoming*, 414 F.3d at 1213 (alteration in original) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994)). Thus, we dismiss the appeal of plaintiffs' claims that (1) the executive and public-health orders, as applied, violate their free-exercise rights, (2) the governor violated the Colorado Constitution and exceeded his authority under the CDEA, and (3) the public-health orders violate the Due Process Clause and Colorado's administrative-procedure act; we further vacate the district court's rulings on these claims and remand with directions to dismiss such claims without prejudice. *See id.* at 1213–14 (noting that "it is frequently appropriate for an appellate court to vacate the judgment below when mootness results from . . . the actions of the prevailing party").

## II.     Remaining Claims

Our mootness ruling disposes of most, but not all, of plaintiffs' claims on appeal: Still at issue are plaintiffs' facial challenge to the CDEA and their claims against the federal agencies. Plaintiffs' facial challenge to the CDEA is not moot because it does not turn on alleged free-exercise violations in the executive and public-health orders but instead on the alleged unconstitutionality of the statute itself, which has not changed. *See Prison Legal News*, 944 F.3d at 883, 885 (finding as-applied claims moot and specifically noting absence of facial challenges). And as to plaintiffs' claims against the federal agencies, we elect to exercise our discretion to set aside any mootness question in favor of a different threshold issue—plaintiffs' standing to bring such claims. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,

16

549 U.S. 422, 431 (2007) (noting courts' "leeway 'to choose among threshold grounds for denying audience to a case on the merits'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999))); *Citizen Ctr. v. Gessler*, 770 F.3d 900, 906 (10th Cir. 2014) (same).

As to these remaining claims, plaintiffs argue that the district court erred in denying their motion for a preliminary injunction. A preliminary injunction is warranted only if a party can show (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) that the "threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) [that] the injunction would not be adverse to the public interest."[12] *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)). As the party seeking an injunction, plaintiffs bear the burden of showing each prong. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003). And because plaintiffs seek a disfavored type of injunction—one that would grant them "all the relief [they] could expect from a trial win"—they face a heightened burden of making a "strong showing" on the first and third prongs. *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019)). Here, the district court denied relief based on the first

---

[12] Although it is not relevant to the issues in this appeal, the third and fourth "factors merge when the [g]overnment is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

prong, concluding that plaintiffs failed to make a strong showing of a substantial likelihood of success on the merits.

We review that ruling for abuse of discretion. *See Awad*, 670 F.3d at 1125. "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.* (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1223–24 (10th Cir. 2008)).

### A.    Facial Challenge to the CDEA

Plaintiffs argue the district court erred in concluding they were unlikely to succeed on their claim that the CDEA facially violates the Free Exercise Clause. When faced with a claim that a law violates the right to free exercise of religion, courts often apply strict scrutiny, a difficult standard that requires the government to justify the law with a compelling government interest and show that the law is narrowly tailored to advance that interest. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). But such strict scrutiny does not always apply to free-exercise claims. Critically, for our purposes, "a law that is [1] neutral and [2] of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. Instead, a neutral and generally applicable law "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006). That is, a neutral and generally applicable law is much more likely

18

to survive a constitutional challenge. *See id.* at 659 (noting "little doubt" that neutral and generally applicable zoning law survived rational-basis review).

Here, the district court concluded that the CDEA was both neutral and generally applicable, rejecting plaintiffs' position "that the CDEA exempts certain secular institutions from its mandates and thus favors those institutions over religious institutions." App. vol. 6, 1424. Because that conclusion rendered the law subject to rational-basis review, plaintiffs' constitutional challenge was not substantially likely to succeed.

On appeal, plaintiffs concede the CDEA's language is neutral but again assert that the CDEA is not generally applicable because "it facially classifies hundreds of thousands of Coloradans as being exempt . . . and in application, exempts even more groups than the statute permits." Aplt. Br. 20. Thus, plaintiffs contend, the district court erred by finding the statute was generally applicable (and therefore not subject to strict scrutiny). *See Lukumi Babalu*, 508 U.S. at 531–32.

A law is not generally applicable when it imposes "burdens only on conduct motivated by religious belief." *Id.* at 543. For instance, in *Lukumi Babalu*, city ordinances prohibiting animal sacrifice but allowing the killing of animals in a variety of other contexts were not generally applicable because they furthered the city's governmental interests in protecting public health and preventing animal cruelty "only against conduct motivated by religious belief." *Id.* at 543, 545. Likewise, we have held "[a] rule that is discriminatorily motivated and applied is not a neutral rule of general applicability." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294

19

(10th Cir. 2004). Accordingly, in *Axson-Flynn*, we remanded for further proceedings on whether a rule that theater students adhere precisely to their scripts, under which a Mormon student was required to use profane language, "was discriminatorily applied to religious conduct (and thus was not generally applicable)." *Id.* at 1280, 1294. On the other hand, the mere existence of "a secular exemption" does not "automatically create[] a claim for a religious exemption." *Grace United Methodist Church*, 451 F.3d at 651. Thus, we have held that a zoning law (under which a church was not permitted to operate a daycare in a particular location) was generally applicable because there was no evidence of discriminatory motivation or application. *See id.* at 651–55.

Here, a review of the CDEA shows that it is more like the generally applicable zoning law in *Grace Methodist* than the religiously targeted or discriminatorily applied laws in *Lukumi Babalu* and *Axson-Flynn*. Colorado enacted the CDEA to limit the "vulnerability of people and communities of [Colorado] to damage, injury, and loss of life and property resulting from all[ ]hazards, including natural catastrophes" such as epidemics. Colo. Rev. Stat. § 24-33.5-702(1)(a). To that end, the CDEA empowers the governor to declare a disaster emergency and issue executive orders to combat such disaster. *Id.* § 24-33.5-704(4). And in the provisions plaintiffs highlight, the CDEA provides that "[n]othing" in it "shall be construed to[] (a) [i]nterfere with the course or conduct of a labor dispute; . . . (b) [i]nterfere with dissemination of news or comment on public affairs; . . . [or] (c) [a]ffect the jurisdiction or responsibilities of police forces, fire-fighting forces, or units of the

armed forces of the United States." *Id.* § 24-35.5-702(2)(a)-(c).

According to plaintiffs, these provisions are "sweeping facial exemptions [that] negate any argument that [the] CDEA is generally applicable." Aplt. Br. 24. But this argument ignores the plain language of the statute. As the district court noted, the so-called exemption for labor disputes does not actually operate as an exemption. By its own terms, this provision actually allows interference "with the course or conduct of a labor dispute" when such interference is "necessary to forestall or mitigate imminent or existing danger to public health or safety." § 24-33.5-702(2)(a). Similarly, the police provision is not an exemption; as the district court explained, it is "an acknowledgement" that the CDEA does not allow the governor "to control law enforcement or armed forces not within his [or her] purview." App. vol. 6, 1425.

And the exemption for news media simply prevents interference with the "dissemination of news," § 24-33.5-702(2)(b); it does not entirely exclude news organizations from the CDEA. The district court accurately characterized this exception as "giv[ing] effect to the First Amendment's Free Speech Clause, which prohibits laws that infringe the right to speak." App. vol. 6, 1424. That the CDEA gives such effect expressly does not mean the statute facially violates the First Amendment's Free Exercise Clause by not mentioning a similar express exemption for the free exercise of religion. Notably, under a prior version of the primary public-health order issued in the emergency disaster occasioned by the pandemic, the State placed news organizations and houses of worship in the same category and imposed

21

the same restrictions on both.

Thus, despite plaintiffs' emphasis on the number of individuals potentially touched by the so-called exemptions in the CDEA, those exemptions do not operate as broadly as plaintiffs would have it. And the mere existence of a secular exemption is not sufficient to establish a claim for a religious exemption. *See Grace United*, 451 F.3d at 651. Further, plaintiffs point to no evidence of discriminatory motivation or application, *see Axson-Flynn*, 356 F.3d at 1294; nor do they argue that the CDEA imposes restrictions only on conduct motivated by religious belief, *see Lukumi-Babalu*, 508 U.S. at 543. Indeed, other than citing three Supreme Court cases for general propositions of free-exercise law, plaintiffs cite no caselaw supporting their assertion that the CDEA is not generally applicable. Thus, because the CDEA appears to be neutral and generally applicable (and therefore subject only to the low bar of rational-basis review), plaintiffs fail to make the required strong showing of a substantial likelihood of success on the merits of their claim that the CDEA is facially unconstitutional. Accordingly, the district court did not abuse its discretion in denying a preliminary injunction on this claim.

### B. Claims Against the Federal Agencies

In these claims, plaintiffs assert that the federal agencies violated both RFRA and the Stafford Act by distributing COVID-19 relief aid to Colorado while Colorado was imposing and enforcing COVID-19 restrictions that violated plaintiffs' free-exercise rights. RFRA prohibits the federal government from substantially burdening the exercise of religion—even if the burden results from a neutral law of general

applicability—except in furtherance of a compelling governmental interest that is the least restrictive means of furthering that interest. *See* 42 U.S.C. §§ 2000bb-1, 2000bb-3. And the Stafford Act—which authorizes the president to provide disaster relief in certain emergency situations, *see Barbosa v. U.S. Dep't of Homeland Sec.*, 916 F.3d 1068, 1069 (D.C. Cir. 2019)—includes a nondiscrimination clause, under which "relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the ground[] of . . . religion." 42 U.S.C. § 5151(a); *see also* 44 C.F.R. § 206.11.

The district court did not reach the merits of these claims because it concluded that plaintiffs likely lacked standing to bring them. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case[]law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish the standing necessary to invoke federal jurisdiction under Article III's case-or-controversy requirement, a plaintiff must demonstrate, at an "irreducible minimum," three elements: (1) an actual or threatened injury that is both (2) traceable to the defendant's challenged conduct and (3) likely to be redressed by the relief requested. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (listing these three elements as necessary "[t]o satisfy Article III's case-or-controversy requirement").

The district court accepted that plaintiffs had shown the required injury,

describing it as "the deprivation of their ability to freely practice their religion due to the restrictions imposed by the" executive and public-health orders. App. vol. 6, 1445. But the district court concluded that this injury was likely not traceable to the federal agencies because "nothing in the record indicates that any action by the [f]ederal [agencies] caused or induced the State . . . to issue the challenged public-health orders" or to keep such orders in place. *Id.* at 1445–46. Instead, the evidence showed that Colorado issued several of the relevant orders "*before* receiving any federal disaster funds" and that the federal agencies did not "condition[] their approval or distribution of aid on the issuance of orders that mandate" any particular COVID-19 restrictions. *Id.* at 1446. The district court also concluded that plaintiffs likely could not show redressability because no evidence demonstrated "that an injunction against future federal aid would lead Colorado to rescind any unlawful" orders. *Id.*

On appeal, plaintiffs first assert that the district court erred by applying the standing test from *Valley Forge* because that case involved taxpayer standing and this case involves RFRA, which Congress enacted "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." Aplt. Br. 48 (quoting § 2000bb(b)(2)). But as the federal agencies point out, the standing test recited in *Valley Forge* derives from Article III of the Constitution and remains the same, no matter the type of case. *See Valley Forge*, 454 U.S. at 472 (explaining that Article III "requires" three-part standing test).

Nevertheless, plaintiffs contend that RFRA itself establishes their standing,

24

asserting that "the words 'traceability' and 'redressability' are not part of RFRA." Aplt. Br. 53. Yet RFRA itself expressly provides that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under [A]rticle III of the Constitution." § 2000bb-1(c). In line with this statutory command, we conduct the usual three-part standing inquiry in RFRA cases. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S 682 (2014).

Thus, to establish standing here, plaintiffs must show injury, traceability, and redressability. Like the district court, we assume the alleged free-exercise violations constitute the required injury. But plaintiffs fail to show either traceability or redressability. At best, they provide conclusory assertions about the federal agencies' alleged participation in the State's free-exercise violations. For instance, they state that the federal agencies "approv[ed]" Colorado's restrictions. Aplt. Br. 52. But even assuming such approval would establish both traceability and redressability, plaintiffs cite no record evidence supporting the existence of such approval. Indeed, on the contrary, plaintiffs do not challenge the district court's finding that Colorado imposed some of the challenged restrictions *before* the federal agencies awarded any relief funds. And this finding negates any implication that Colorado imposed the challenged restrictions as a result or condition of receiving such federal aid or that it would rescind such restrictions if the aid were halted.[13]

---

[13] Plaintiffs cite a variety of inapposite authority that has little to do with standing, including Federal Rule of Civil Procedure 65, which governs preliminary

Thus, because plaintiffs point to no record evidence that the State imposed unconstitutional restrictions as a result or condition of receiving federal COVID-19 aid or that enjoining such federal aid would cause the State to amend or rescind its orders, plaintiffs have not met their burden to establish either traceability or redressability. Accordingly, plaintiffs lack standing and therefore fail to make the requisite strong showing of a substantial likelihood of success on the merits of their claims against the federal agencies.

**Conclusion**

Because the State no longer imposes any COVID-19 restrictions on plaintiffs, all but one of their claims against the State are moot. And the State has met its burden of showing that the voluntary-cessation exception to mootness does not apply; there is no reasonable chance that the State will impose similar restrictions on these plaintiffs again. For the same reason, the mootness exception for conduct capable of repetition but evading review also does not apply here. Accordingly, we dismiss as moot plaintiffs' claims that (1) the executive and public-health orders, as applied, violate their free-exercise rights, (2) the governor violated the Colorado Constitution

---

injunctions and restraining orders; the Restatement (First) of Torts § 876 (1939), which describes tort liability for those who act in concert; and *Reliance Insurance Co. v. Mast Construction Co.*, 84 F.3d 372 (10th Cir. 1996), which concerned whether a nonparty was bound by a restraining order. Moreover, these authorities on participatory liability do not help plaintiffs overcome the evidentiary problem that dooms their standing argument. That is, even assuming that federal aid could cause a state to impose unconstitutional restrictions—such that a federal agency could bear some level of responsibility for unconstitutional state restrictions—there is absolutely no evidence of that occurring here.

and exceeded his authority under the CDEA, and (3) the public-health orders violate the Due Process Clause and Colorado's administrative-procedure act, vacate these portions of the judgment and related interlocutory rulings of the district court, and remand the mooted claims to the district court for dismissal without prejudice.

As for the facial challenge to the CDEA and the claims against the federal agencies, plaintiffs fail to make a strong showing of a substantial likelihood of success on the merits of such claims. The CDEA is likely constitutional because it is neutral and generally applicable and subject to rational-basis review. And plaintiffs lack standing to bring their claims against the federal agencies. We therefore affirm the district court's order denying a preliminary injunction on these claims.

Entered for the Court

Nancy L. Moritz
Circuit Judge